May it please the Court, Frances Kamen are appearing on behalf of Student R.A. and Parents. The backbone of the Individual with Disabilities Education Act is to provide disabled students with free and appropriate education. The Individual with Disabilities Education Act, known as IDEA, as a key component, requires and fosters the collaboration and cooperation between school districts and parents. Very important to the process, a cornerstone, as described by our Supreme Court, is parent participation in the process. In this case, the school district violated the rule that a child, R.A., receive an evaluation in all areas of need when they refused to go forward with a psychological, psychoeducational, and behavioral assessment. Apparently, there was some efforts to go forward with the psychological assessments, but there was a lot of problems because they couldn't come to an agreement, and it looks like R.A.'s mother wanted to be able to see and hear the testing conducted on R.A. in connection with this E.P. assessment, is that correct? Correct. What authority requires the district to permit that, to allow that? Well, R.A.'s mother and father had agreed in writing, vis-a-vis the settlement agreement that had been entered into three years earlier, that they consented to the specific assessments that were set forth in the settlement agreement, and that they would produce R.A. They never said, ever, that they wouldn't produce R.A. at any time. The impediment was the insistence by R.A.'s parents that R.A.'s mother be able to hear and see, and I'm sorry, you're saying that the district, from what I can tell, you're arguing that the district was unreasonable. It looks like we have to see if there was any legal authority that would have required that, or was there any? I disagree. I disagree that there has to be a specific legal authority that says R.A.'s mother can hear, and that is really what is at issue, because there was no question that she was going to be able to see it. Everybody agreed that she could be outside the room. Is your argument that it's unreasonable for them to say that she also can't hear the specific questions that are being asked? Well, it certainly was unreasonable for them to say that she could not hear the specific questions. But they gave reasons. Well, they gave reasons, but they're not very well-supported reasons, not supported at all. In fact, they have made a blanket statement that it would impact the testing environment and that it would affect the validity of the test, but they provided nothing to support that contention. Well, the vote's still on, though, here. Isn't the verdict on the petitioner here, on the plaintiff? No, it's not, not for that aspect of it. We proved an unskated adremophage case that the assessment was not completed, and then it shifted to the school district to show that their performance was excused because of unreasonable requests on the part of the parent. So they needed to prove that the request here, because, remember, seeing is really not in question, was unreasonable. And there was no evidence at all that it was unreasonable. It is, in fact, supported by the law in a broader sense. So the fact that both the ALJ, in this case the Administrative Law Judge, and then the District Court Judge said that in order for it to be reasonable, the student had to prove that the school district's denial was unreasonable is misplaced in a misinterpretation. The assessment, well, why don't you explain in your words what they were trying to find out in this little proceeding that we're talking about here, when they were trying to clarify the child. Okay, what was the purpose of that? RA is an autistic child. Psychoeducational and behavioral assessment included cognitive, academic, and behavioral evaluations of this child. And those are key to determining what his needs are, what his progress is, what his current level of performance is, and what would be an appropriate placement. In this case, the school psychologist, Jordan, had observed him for approximately three hours, and that was the extent of it. She never conducted any of her academic tests. She never conducted any of the cognitive tests. And she hardly knew RA. She had met him five years earlier, conducted a small portion of the autism assessment, and she didn't write the report. She herself said that RA was uncomfortable with her when she went to the house. All the more reason why the mother, who had been supervising the educational program at home, where there was significant evidence that RA had progressed well, should know what is going on in the assessment room because it was the mother who would know. But in the assessment room, is that where the casting was? What were they assessing in that room? What were they using in order to assess the performance of the child? Well, in my brief, I do list the assessments that Jordan said she was going to conduct. And they included achievement tests. They included psychological tests. They included numerous others, all of which were tools or comparable tools that the mother and the home school teacher had been using over the years. So they were standardized? They were standardized, yes. Everything that was part of the educational portion of the evaluation was to be standardized. The behavioral portion was not necessarily standardized. I wanted to ask you about another aspect of this case and another issue you raised. And I wanted to know in what sense or why you think that the placement was predetermined. Well, the key reason is because of two key reasons. One is that the assessment process was incomplete, and so how would anybody know what was an appropriate placement until the assessment process was complete? And second of all, only the school district knew when they went into the second meeting that they were considering private placement, the school ANOVA, as possible placement. The CFR specifically says that if the school district knows that they are considering private placement, then they must have a representative of the private placement that they're considering there. And that makes sense because particularly if the mother didn't know and this private school had never met the child, in order to appropriately develop an IEP and include inputs on the mother and have an engagement between the mother and the private school, that person would have to be there. And the school districts claimed that having Ms. Anderson there as a surrogate for the school is without merit because Ms. Anderson, in numerous correspondence that is cited to in the brief, said, well, we don't really have an answer to your questions, Dr. Habash. You'll have to contact the school. They didn't know much about it. And... It's a little different. It's somewhat the same, but how did RA's placement at ANOVA, I think that's probably how they say that it's in a more constituted, more restrictive environment, than the placement at an individualized one-on-one instruction within the walls of a public school. And everybody is very empathetic or sympathetic as to what we do up here to everybody's situation. Families are in a difficult situation, and often the school board is in a difficult situation. But the question is, having this placement at ANOVA, it's actually a more restrictive environment than what would have been in a public school setting. It wouldn't. As best we can tell, with an incomplete assessment, RA absolutely needed to be in an environment where they were typically developing peers. And that very essential element for an autistic child, in order to develop appropriate social skills, was missing from ANOVA. The director admitted to that unequivocally during examination, and he indicated that he disagreed with the national standards that, in fact, autistic children should be integrated with typically developing peers. He thought that they were better off in an environment with disabled children. And that is the key element. Mother had testified to RA's regression when he was placed in an environment with all disabled children. And nobody wanted that to happen again. And that is why we know that ANOVA itself was not the least restrictive environment. But the other option that was considered was at the public school, but in essence it was going to be RA by himself in a neat room, if I understood the other option correctly, one-on-one, and the only other time that RA would have any involvement or interaction was going to be lunchtime. And how is that compared to what we had at BU? I mean, it seems like those were the choices of the least restrictive environment, and I'm not quite sure your criticism of ANOVA, but you had a lot more interaction with other folks on a day-to-day basis, an environment that was geared for that. How does that compare to him being isolated most of the day except for lunch? Well, it's like comparing apples to oranges, but the fact is that even though the classroom would be self-contained, RA would be exposed to typical developing peers during breaks. And according to the testimony of Dr. Powers and the National Standards Report, a little bit of exposure to typical developing peers doesn't have to be throughout the day. It's sufficient to give the autistic child the exposure that they need. I'm with request of this Court that I be permitted to reserve time for rebuttal. You have the remaining amount of time for rebuttal. Thank you. Thank you. May it please the Court, Stephanie Burrell on behalf of the Vice-Commissioner of Study in the High School District. This Court is correct that the district did make numerous efforts to schedule the psychoeducational and behavior assessments, and their ability to complete those assessments was dependent on preparing a parent's parents, making him available for the assessments. And the communications, the numerous communications in the record, demonstrate that unless the district allowed full observation of the assessments, his parents were not going to produce him and make him available for the assessments. And contrary to the public's assertion that the school district's reasons for not allowing observation were unreasonable, the district's longstanding policy is actually in line with the purpose of assessments. The purpose of the assessment process is to allow the school district to collect the most accurate data available on a student's current levels and their abilities and functioning so they can take that data to an IEP meeting and develop the most appropriate IEP to meet that child's unique needs. So the accuracy of the data is very important. In fact, there are regulations and laws in place that emphasize the importance of the accuracy. Assessments must use technically sound instruments. They must be in a form and language to yield the most accurate results. So what was the main, according to the participants, the most critical reasons, or the most critical reasons, why the mayor and your counsel allowed them to hear was due to the hearing part of the assessment? The concern was that it could affect the professor and the student. So if the student is somehow aware that someone's listening to what they're saying, it could affect their behavior. If the student were here, would the student be aware that they were watching? It's possible. This has never happened. And then it worked that way. I'm sorry, can you? It's not supposed to work that way. The student's not supposed to know that somebody's watching. Correct. And the concern was that maybe they would be aware if they saw the parent during a break, that they would be aware that they were there. But also, the assessor themselves can be affected. And Dr. Jordan testified that there's concern that a parent who's observing who might not be trained in the assessment process would be misinterpreting the information, and that could affect the behavior and the way the assessor conducts the assessment. I would assume that the person doing the assessment is a professional, that they would follow a protocol, and that they would be sufficiently trained that they wouldn't be affected. They shouldn't be valid for somebody listening in, should they? They can be. I think that when they listen. Well, I think that the student is a professional, should they? Yeah, we know it's a professional, but I think it could be human nature. In any profession, if someone knows that someone's watching them and observing what they do, it could affect subconsciously how they're behaving. And the test publishers know in their manuals that any non-standard condition, third-party observation, could result in scale scores that are not statistically or psychometrically accurate. And the concern was it would be a non-standard test condition. It could affect the assessor or the student and would not necessarily yield the most accurate results. And the district had this policy in place to make sure that that was never going to be Did I read the whole document? Has the district allowed other parents to see and hear the testimony of their students before? They only allowed it in very limited circumstances. If the child was extremely young or if there was a serious safety concern. And in that case, they would allow the parent to be outside the room. But it was the district's policy that had been in place. So doesn't that eliminate your argument that the tester or assessor would be affected? Because in some cases, they're clearly not affected. Well, in some certain cases, the safety concern outweighs that. But in normal circumstances, when there's not a safety concern and when the child is not extremely young, the policy is let's not have the parent observing to ensure that we do get the most accurate data available. And Helen's mother, the only reason she gave at the due process hearing for wanting to observe was to maintain the integrity of the process. And in most instances, the parents of disabled students are not going to be treated in the assessment process. And so they're not going to have the knowledge to know whether or not the integrity is being maintained. And in this case, there was no evidence in due process presented that Dr. April Jordan was not capable of accurately conducting the assessment. She had done over 400 psychoeducational assessments, half of those on children with autism. She had done hundreds of behavioral exams. And so there was no reason why Mother Wynne presented to have a concern that there was an issue with the integrity of the assessment process. And there are procedural safeguards in place for parents to address the assessment process. And these procedural safeguards ensure that parents get the relevant information regarding the assessments and ensure that their voice is heard. In particular, after the assessment is conceded, parents have a right to review their child's responses to the assessment. They have a right to review the report of the assessment. They have the right to attend and actively participate in the IEP meetings that discuss the assessments and assessment reports. And then if they're unhappy with the assessment results and they believe that they're inaccurate, then they're allowed to ask. Well, there are a lot of things that they can find out about. But I guess what's bothering me is there was a settlement here. These assessments were being conducted pursuant to the settlement agreement. And it wasn't clear to me what the school district said, that they could watch the assessment but not hear. Was that because the settlement agreement authorized that? Or were they making a concession? Or what was going on? In the settlement agreement, there's absolutely no conditions. The parents agreed to make the student available at his current educational placement and at a district site. And that was the extent of the agreement, that the district would conduct these assessments and they would make their child available. The reason why they allowed or they offered the Cameron School was because they were trying to get these assessments done. The district has always wanted to assess the student, and that's why when they realized that they were not going to have unconditional consent to do the assessments, they filed for due process to get permission to move forward with the assessments And that's absolutely condition restriction because they want to assess the student. They want to get this information. They want to put together the best IEP they can for him. But why was the role of the private school representative not present at the IEP meeting? First, I'd like to highlight the fact that the issue has always been whether or not the placement at Inova was predetermined. The issue has never been whether or not the district denied an appellate for inappropriate public education because a representative from Inova was not at the meeting. The issue has always been predetermination. As you process, the issue is always predetermination. And the fact that an Inova representative was not at that meeting does not evidence predetermination. Predetermination means that the school district came to a decision about placement before the IEP meeting, that it came to the IEP meeting with a take-and-release offer and failed to consider other placement options. And the evidence actually shows the exact opposite. At the IEP meeting, numerous options were discussed, full inclusion, different services and applications of full inclusion. Then there was the discussion of mothers' choice of a one-on-one placement at a public school. There was another non-public school discussed, STARS Academy. And then at the very end, Inova was discussed. Appellate's mother actively participated, and both IEP meetings were very lengthy, and she actively participated in the placement discussion. So there's no evidence that the district came to that IEP meeting with a, this is Inova, we're placing it here, we're not really considering any other options. That's just not the case. The fact that an Inova representative wasn't there is evidence that the decision wasn't predetermined. They didn't know for sure that they were going to place it there. It was just one-on-one. There was no prior hearing of a chance to have any interaction with the representative, right? Yes. The school district immediately, once they decided that it's a- Was that really serious? As soon as the school district determined that Inova was the proper placement, they made arrangements to have the family tour the school, meet with the director of the school, ask any questions they had. And several members of the IEP team immediately did have information about Inova. They had talked to the director ahead of time. They were familiar with it being discussed at other IEPs for other students, so to acknowledge it was a procedural violation. Another ref should have been able to meet if they were going to consider it. Anything else you'd like to add? Yes. He should have been there, but, again, that was never the issue at the due process and at the district court, and it did not seriously infringe upon parents' participation. That's the standard. It only denies a free and appropriate public education if it significantly or seriously infringes on a parent's participation in the IEP formation, and that's not the case. We have evidence that there was two lengthy IEP meetings, and Helen's mother produced 800 pages of reports. Those reports were discussed. She presented the information. His home school teacher presented information, and she actively participated in both those meetings and developing his goals in the placement discussion, and so her participation in the IEP formation process was never significantly infringed upon. Do you, I guess, or... If we determine that there was a problem with the assessment, do we have to determine whether or not, is there any level of practice of assessment, or do we just say, do we have to review for practice? I'm sorry. I don't think I understand the question. Let me rephrase that. I guess if we determine that the parents should have been allowed to hear and see the testing, what happens? Does it go back to the ALJ, or what would be the result? Jordan, I believe it would go back to the district court, or if they had an ALJ. I'm going to have to say, I apologize if you don't know. Again, we believe that the parents have a right to see and observe. They never provided any legal authority. In fact, their own witness testified that she was not aware of any legal authority. They have a right to watch. The district's policy was no observation at all. They were trying to compromise. They wanted to complete the assessment. That's what the answer I'm getting. Yes. My hope is, if they agreed that they could watch, and I'm not understanding what the reason is, they could not hear. The hearing component was that, and Dr. Jordan testified to this, that she would be concerned about the person misunderstanding what she was saying, and she'd be preoccupied with the fact that the untrained observer would be misinterpreting the assessment process, and that would be essential behavior in the assessment and could affect the accuracy and validity of the results. Well, I would think that would be the same objection to seeing it. So you say, well, it's a compromise. People are halfway, and then they continue to refuse. I'd like to quickly address the discussion on the least restrictive environment. The parent never met their burden to show that it was the least restrictive environment, just because Lenova had all disabled students does not mean that it was not a proper placement. The evidence does not show that it could not support his social skills. In fact, he had a strong social skills component and program, and the IABT members testified that it would allow him to socialize in a more naturalistic setting. The speech and language assessor said that his goals would not be met in a situation where he was one-on-one. And Lenova, the evidence that he regressed from his mother was when he was in kindergarten. There was no evidence to show that if he was placed in Lenova, that he would regress or that he wouldn't obtain an educational benefit. And Lenova was to be a transition placement because he had been in a homeschool placement for so long, there was a concern that it would be too difficult for him to transition right away to a general education campus. That campus, there was testimony that its share of the high school is very large, many students, very noisy, and he had sensitivities to noise and crowds. And Lenova would allow him as a transition placement to settle in, be in a small classroom with a small number of students, allow him to work on his social skills that he wasn't able to do in the homeschool program. And then hopefully, the idea was that they could eventually transition him to a regular campus and potentially a full inclusion classroom. Let's see, if there aren't any further questions, the district's passed. Thank you. Thank you. Thank you. Thank you. There are several things I would like to point out. The school district didn't complete the assessment. This is a violation of the IEP. It was their affirmative defense that they were excused an affirmative defense and required them to approve by a preponderance of the evidence that the student's request and mother's request to hear was unreasonable. They have not done that. Most of the evidence that they presented had to do with students being present in the room, parents being present in the room. They had absolutely nothing that they presented regarding a parent being outside the room where they could hear and see through a one-way mirror or some other device. Students, on the other hand, presented a significant amount of evidence well beyond preponderance that, in fact, the process of observing, fully observing assessments from outside the room is a common practice that does not alter the testing environment. The fact that the California Diagnostic Centers, who are part of the California Department of Education, which is a supervising agency for the school district, does this routinely, we showed that in the last year prior to the hearing, 333 such assessments were done where parents observed and heard from outside the room took place that did not affect the validity, the validity. That is pretty efficient evidence of reasonableness. Furthermore, the school district had no policy about parents seeing and hearing from outside the room. Their policy was limited only to the inside the room, which mothers needed to find a way. That is the ultimate relief that you want here. If we were to agree with you, what would you request? I'm sorry, Your Honor. What's your request for relief? If we agree with you that there should have allowed the parent to hear as well as see what's the effect on the determination here, what relief does that get you? What are you seeking? By not being able to see the assessment and hear the assessment. Parents were deprived of information that now the district is only privy to. Do you want another assessment? We want an assessment where the parents are permitted to see and hear, and we want another IEP set up so that this child can return to some kind of appropriate placement through the public school system. But it's entirely possible that with another assessment, the child will have the same placement. Well, the placement won't be an over because it's no longer a certified public agency. But whatever the placement is, at least the parents will be on even ground with the school district at the time of the IEP. At the time of this IEP, the parents would have had no information about what went on in the room. And without having that information, they're not informed about information that is essential to know so that they can decide whether an independent evaluation was necessary or just knowing how their child would react under different circumstances. Thank you very much. I appreciate it. Okay, thank you. Thank you. And is it Ms. Kaminer? Yes. Is that how you pronounce your last name? Yes. Okay. And Ms. Barrow, thank you both very much for your presentations here today. The matter of RA versus West Contra Costa United, the unified school district is submitted. And we are proceeding to the next case on our docket, which is Cornelio De La Cruz-Salas, Jr. versus Jefferson Sessions.
judges: Schroeder, Murguia, McCalla